126 So.2d 658 (1961)
Matthew LEDBETTER et al.
v.
HAMMOND MILK CORPORATION et al.
No. 5168.
Court of Appeal of Louisiana, First Circuit.
January 30, 1961.
*659 Joseph A. Sims, Hammond, for appellants.
Faris, Leake & Emmett, New Orleans, for appellees.
Before ELLIS, LOTTINGER, HERGET, JONES and LANDRY, JJ.
ELLIS, Judge.
This tort suit was instituted by Matthew Ledbetter on his own behalf and on behalf of his minor children, David Ledbetter, and Donald Ray Ledbetter, against Hammond Milk Corporation and Claude W. Watts, for physical injuries and other damages received in an automobile accident which occurred on February 11, 1958 near Hammond, Louisiana.
Johnny Smith, the owner of the automobile which Matthew Ledbetter was driving, joined Matthew Ledbetter in these proceedings to obtain $50 deductible item of damages which he was required to pay on his automobile as a result of the accident sued upon.
A civil jury trial was had and verdicts were returned for the plaintiffs on February 23, 1959.
Matthew Ledbetter was granted a judgment for $14,368.40.
David Ledbetter was granted a judgment for $5,000.
Donald Ray Ledbetter was granted a judgment for $2,000.
*660 Johnny Smith was granted a judgment for the $50 which he sought.
The defendants filed a motion for a new trial and the District Court signed the order granting a new trial on March 9, 1959. However, prior to the date upon which the new trail had been set for hearing, plaintiff's counsel, and the attorney for defendant, entered into a joint motion and order and stipulated that since the record in the case was complete, expense and time would be saved by submitting the matter on the record as then constituted. The case was thus submitted on the 10th of October, 1959.
Judgment was then granted by the trial court reducing the original judgments obtained in the following respects:
Matthew Ledbetter was granted $3,000 for pain and suffering in connection with his own injuries. He was also granted $1,285.44 for loss of wages and $5 travelling expenses.
Matthew Ledbetter, acting for and on behalf of his minor son, David Ledbetter, was granted judgment in the full sum and amount of $1,000. Matthew Ledbetter in his capacity as administrator of the estate of his minor son, Donald Ray Ledbetter, was granted a judgment in the full sum and amount of $750. The expert witness fees of Dr. A. J. Feder and Dr. J. DeLoach Thames were fixed at $50 each and taxed as court costs.
Johnny Smith was granted judgment as before in the sum of $50.
No medical expenses were allowed, but the right was reserved to both Lallie Kemp Charity Hospital and to Dr. A. J. Feder to legally claim the medical bills which were claimed by plaintiff in these proceedings.
This judgment was rendered in January, 1960 and signed on February 23, 1960 with written reasons assigned. Plaintiffs' attorney filed a motion for a new trial or rehearing on February 25, 1960 but said motion was denied.
On appeal, opposing counsel agreed upon one point. The decision as regards liability was correct, but the question of quantum was at issue.
Since this is a question of quantum it would be well to review the medical reports and testimony regarding pain and suffering.
The attending physician, Dr. A. J. Feder, examined Matthew Ledbetter on February 12, 1958 and testified that Ledbetter gave him the history of having been injured in an automobile accident in which he claimed that he was knocked out for an undetermined period of time and was taken to the Lallie Kemp Charity Hospital for emergency treatment where his knee and skull were x-rayed; he complained of pain in his head, mid-back region, and abdominal tenderness, besides his knee. On February 17th during treatment he complained so much that he sent him back to the hospital, trying to rule out a possible internal injury on his abdomen, but they x-rayed him and they told him to return to Dr. Feder. Ledbetter also complained about his head, vomiting, headaches and pain and disability in his right knee with swelling and pain in his lower back, abdomen and his abdomen was distended and very tender. When he first came to Dr. Feder he was helped in by some attendant and he walked stooped and had difficulty in getting on the examination table for a regular physical examination. There was a laceration over the right knee cap which was swollen and painful and he had almost a complete loss of motion in that knee. The swelling was up into the thigh, and a full examination was not possible due to the spasms and limitation of motion in the knee. X-ray at that time did not show any fracture or any type of other bone injury in the area. He complained so much that Dr. Feder sent him to an x-ray specialist in Baton Rouge to try to rule out something that he might not have picked up, and it came back negative. There were not any broken bones in the knee to account for the swelling and *661 limitation of motion. The left knee was swollen. There was an abrasion and small laceration over the left kneecap also and only about ten per cent limitation in motion in that knee, which was attributed to the bruise on the knee. There was a two inch laceration over the left side of his head through the outer layer of the scalp on the left side, and there was pain which he complained of over the area of laceration, which was considered normal. He complained of being dizzy and nauseated and of vomiting. His pupils were equal. His nervous system apparently was normal. There was not any abnormal reaction to light and accommodation from his eyes and the skull x-rays were negative. Dr. Feder had these x-rayed by the specialist since he complained so much in the area, and it was negative. His lower back region was tender and marked limitation of motion and inability to stretch his leg due to pain in his back. The muscles were very tense in the back and he could not stoop. The x-rays in this area were negative for fracture and Dr. Feder's diagnosis in the case was contusion, severe, to the right knee and with treatment definitely showed a traumatic synovitis which usually comes on after a severe injury on a knee. He had a contusion of the left knee which was not serious. He had a concussion of the brain and scalp laceration and he had a contusion sprain, rather severe, of the lumbosacral region, and contusion of the abdomen.
Three months and eighteen days after the accident Dr. Feder gave a report about which he testified as follows:
"My report at that time stated that this patient has cleared of all acute injuries, but still does have lower back pain compatable with a lumbosacral contusion and sprain. His left knee is still symptomatic, but I feel that he will clear completely within the next two months. He has been unable to work to date due to the back condition, but I feel that with progressive improvement he will be able to return to work in the next 8 weeks. My bill to date covering physical examination, 58 treatments, physio therapy (diathermy) treatments of the back, 50 office visits and consultations, drugs for pain, muscle spasm and concussion, x-ray, local injection lumbosacral region is $484.00. I estimate the additional treatment to be about $100.00.

* * * * * *
"The additional bill was $20.00 more, because after I discharged him I saw him a few more times, four or five times, and the total bill was $504.00, it was $20.00 more."
Dr. Feder last examined the plaintiff on November 19, 1958, when plaintiff came into his office complaining of pains in his lower back and in his knee. At this time, Dr. Feder found that plaintiff's symptoms were "mostly subjective." Dr. Feder made the observation after this last examination that he did not think the plaintiff would be left with any permanent disability and that he consented that the plaintiff was able to do heavy work.
When questioned concerning whether or not plaintiff was still in pain, Dr. Feder said, in effect, that it was possible, but there were no objective findings that supported the claim.
Dr. DeLoach Thames examined Matthew Ledbetter on February 5, 1960, and found that he had no difficulty in disrobing, no difficulty in getting on the examination table and no positive findings on examination, except that he complained of tenderness of the lower portion of his back when Dr. Thames palpated or pressed over his lower back over the sacrum. Dr. Thames found no evidence of muscle spasms.
After reviewing this record the trial court concluded that Ledbetter had recovered from the injuries received in the accident, but may have intermittent recurring pain which would not be disabling.
*662 This seems to be a fair summary of the reports and doctors' testimony in this case.
It should be noted here that Matthew Ledbetter stated that he quit working in November of 1958, because the job was "wound up", and that he had not worked before or since because he had been unable to find work.
As stated before, the trial court granted Ledbetter a judgment of $3,000 for pain and suffering in connection with his own injuries.
Attorney for plaintiff relies strongly upon the case of Le Bourgeois v. Indiana Lumbermen's Mutual Insurance Company, La. App., 101 So.2d 720, 727 and the case of Marcantel v. Southerm Farm Bureau Casualty Insurance Company, La.App., 102 So. 2d 879. These cases are both distinguished from the case at bar on several points.
In the Le Bourgeois case it was apparently concluded that the plaintiff, Ida Le Bourgeois Bruce, had injuries which included back injuries of an uncertain duration and a traumatic neurosis and the doctor "believed that the actuality of the pain was as real to Mrs. Bruce as if she had pathology."
There are no such tests regarding plaintiff's complaints in the case at bar.
In the Le Bourgeois case, a $9,000 judgment was affirmed for the pain and suffering of Ida Le Bourgeois Bruce.
There are several distinctions which should be drawn between the Marcantel case and the case at bar. In the first place, after emergency treatment was given, there were seven doctors who examined the plaintiff. Several of these doctors were specialists. All but one of these doctors "found some basis for plaintiff's complaint of low back pain such as muscle spasm". The seventh doctor gave testimony to the effect that he had run several tests which he contended disproved many of plaintiff's complaints and he also stated that at no time could he find any objective symptoms or reasons for plaintiff's complaints. However, the preponderance of the medical testimony was contrary to this doctor's reports and established the inability of plaintiff to perform heavy carpentry work during the year 1956 with a mild back disability of 1957.
In the case at bar, the plaintiff was given emergency treatment at Lallie Kemp Charity Hospital and was treated over a period of several months by one general practitioner, Dr. A. J. Feder, and was examined approximately one year after the accident by Dr. DeLoach Thames. No specialists examined plaintiff and he was never hospitalized for his injuries.
In the Marcantel case, the plaintiff was found to have suffered almost constant pain. In this case, the pain was apparently severe for a short duration of time and thereafter intermittent. Taking plaintiff's version of his suffering, the pains were only aggravated by the heavy work that he did in October and November of 1958.
In addition, the plaintiff in the Marcantel case suffered excruciating pain for approximately 24 to 48 hours as a result of a myelogram. In this case no myelogram was run. Plaintiff, himself, did not complain of constant pain, nor did he claim disability for a period in excess of 24 weeks as a result of the accident sued upon.
Thus it can be seen by a summary review of the facts and doctors' reports found in the Marcantel case and the facts and doctors' reports available in this record, that there is apparently a great divergence in the degree of severity of the injuries received by Marcantel and those received by Ledbetter.
Counsel for plaintiff also cites a case on traumatic neurosis based upon a general observation made by Dr. Thames that the pain was in plaintiff's mind. There is not enough medical evidence in the record to draw a conclusion that plaintiff actually did suffer from a traumatic neurosis.
*663 The defendants cite several cases in support of the trial court's award. Janice v. Whitley, La.App., 111 So.2d 852; Ferguson v. Highway Ins. Underwriters, La.App., 109 So.2d 289; and Thompson v. Audubon Ins. Co., La.App., 101 So.2d 752; Simmons v. Pierce, La.App., 104 So.2d 258; Le Jeune v. U. S. Fidelity & Guaranty, La.App., 105 So.2d 327; Watts v. Delta Fire & Cas. Co., La.App., 106 So.2d 752; Pierson v. Hartford Acc. & Indem. Co., La.App., 107 So.2d 465; Langlois v. Continental Ins. Co., La. App., 107 So.2d 492 and Jenkins v. Audubon Ins. Co., La.App., 110 So.2d 221.
A detailed summary of these cases is not considered necessary here. In view of the awards granted in similar cases and the facts hereinabove stated, we feel that the award to Matthew Ledbetter for pain and suffering should be increased to the sum of $4,500.
The lower court denied judgment for any medical expenses or expenses to and from the doctors' offices, with the exception of two trips to Lallie Kemp Charity Hospital at $5 per trip.
It is felt that the holding of the lower court as to the claim for any amounts due Lallie Kemp Charity Hospital as a result of treatments given to Matthew Ledbetter, Donald Ray Ledbetter and David Ledbetter for injuries sustained in the accident sued upon is incorrect. It is true that the requisites of LSA-R.S. 46:9 et seq. were not complied with in this case. The case of Green v. Marquette Casualty Co., La.App., 79 So.2d 116, is cited as authority by the District Court. In that case the Charity Hospital was not a party to the suit, by intervention or any other method, and the only reference to any claim the hospital might have had was the introduction of the Charity Hospital bill into evidence. This was found to be insufficient to support a judgment for such expenses under the authority of the above-cited statutes. However, plaintiff in this case set up his indebtedness to the Charity Hospital in his original petition. This indebtedness was substantiated by testimony and evidence. There is no reason given why such a claim cannot be sought and enforced by the plaintiff, in lieu of any action taken by the Charity Hospital under the pertinent statutes. The right of subrogation provided by the statutes presupposed a right of direct action. For these reasons, judgment is granted herein for a total of $113 for treatment received by plaintiff and his two minor sons.
The bills of Dr. Feder are also at issue. There is no indication in the record that these bills were not incurred in good faith, both on the part of the doctor and on the part of the patients. The trial court observed that the plaintiff, Matthew Ledbetter, was an indigent colored man and could easily have obtained medical care at the nearby Charity Hospital. For this reason the claim was denied. However, there is no reason in law or equity why an individual may not be treated by a private physician and incur just debts thereby although that individual is unemployed and impecunious at the time. We cannot decide where a patient should have received treatment for injuries after these treatments have been made. The statements for professional services rendered by Dr. A. J. Feder are recognized as uncontested, valid claims and, as such, judgment will be rendered to cover same in the amount of $504 for treatment of Matthew Ledbetter, $178 for treatment of David Ledbetter, and $204 for treatment of Donald Ray Ledbetter.
The bills of Doctors Malen and Woolfolk were denied on the basis that the x-ray examinations made by them were made merely in preparation for this suit. The x-rays were made soon after the accident and Dr. Feder's uncontested testimony is that he feared more extensive injuries and possible internal injuries which had not shown up on his x-rays. For this reason, he stated, he sent Matthew Ledbetter to the specialists for further studies in regard to treatment. The x-rays confirmed his original findings and were used in no *664 way to support a claim for injuries. For these reasons, this court feels that the bill of Doctors Malen and Woolfolk for x-ray examinations of the plaintiff should be allowed in the sum of $40.
On appeal, plaintiffs seek no more than the $10 allowed by the District Court for two trips to Charity Hospital and this award is accordingly affirmed.
For the reasons stated above, in regard to the statement of Doctors Malen and Woolfolk the travel expenses to and from their offices will be allowed as an item of damages in the sum of $10.
The testimony of the plaintiff in this case was to the effect that he had hired a relative of his wife to take him from his home to Dr. Feder's office and back home again at a charge of $2 per round trip. This was cheaper than taxi hire which would have been $1.75 each way. This testimony was uncontradicted and defendant's attorney did not object to this type of proof. The doctor's report, which was not contested in this respect, indicates that the Ledbetters made a total of fifty-eight trips prior to May 29, 1958 and Matthew Ledbetter made four trips to his office thereafter. Plaintiffs claimed expenses for 27 and 37 trips for the two boys respectively. There is no indication that they did not travel with their father when they made their trips to the doctor. For this reason their trips will be included in their father's total of 62 trips.
The trial court denied this item of damages for lack of stricter proof. However, there was ample opportunity for the defendant's attorney to require strictor proof or object to the proof on this item. He did not do so. This court feels that, under the circumstances, the charges made were sufficient but not excessive and the proof of same was adequate. For these reasons, judgment will be rendered herein in the amount of $124 to cover the expenses of transportation to and from Dr. Feder's office from plaintiff's home.
Plaintiff's counsel claims that plaintiff's claim for loss of wages should be based upon the wages which he made at Kaiser Construction Company although this employment had been discontinued over the winter months and the last month in which plaintiff had been so employed was in November of 1957. No authority is cited for reaching such a basis for loss of wages. Plaintiff was admittedly employed at an average wage of $53.56 per week for several weeks prior to the date of the accident. We quote from the trial court's written reasons for judgment with approval:
"Defendant submitted proof, together with plaintiff's own testimony that for several weeks just prior to and up to the time of the accident his earnings were $53.56 per week. In view of this evidence and the statement of plaintiff's counsel in his memorandum in opposition to application for new trial: `It must be noted that plaintiff engages in the construction business where employment is seldom constant throughout the year and where earnings vary from week to week, dependent upon the hours worked, weather conditions and many other factors,' and in view of the further fact that there was no additional proof in this connection produced by plaintiff under the order for new trial granted March 9, 1958, in which the court indicated further proof was necessary, the court believes that the amount of $53.56 per week in lost wages would be fair, since that is the amount he was earning at the time of the accident. This would make a total for lost wages of $1,285.44."
The judgment of the trial court in this respect is affirmed for the reasons assigned.
David Ledbetter, plaintiff's nine year old son, received injuries in the accident which consisted of being rendered unconscious after the wreck, contusion and trauma to his chest and abdomen, contusion *665 of his head, and a complete evulsion of a small section of his scalp on the top of his head. He was under treatment for two months and twenty-one days. During the treatment of the denuded area of his scalp, which was described as a very deep injury, the wound hemorrhaged, and the blood spurted to the ceiling in the doctor's office. The wound had to be cauterized and sutured again. The other injuries healed without incident. As a result of the wound on David's scalp he has "a permanent denuded area" of about one inch in circumference, "devoid of hair as a residual."
The trial court awarded a judgment of $1,000 for pain and suffering resulting from these injuries.
The case of Higginbotham v. Frazier, La.App., 92 So.2d 89, is cited by plaintiff's counsel in support of the $2,000 verdict sought in regard to David's scar and other injuries.
An examination of the facts in the Higginbotham case shows that the type of scars and their cosmetic effect was more detrimental than is David's scar.
David Ledbetter had an obviously painful wound which hemorrhaged weeks after the accident and required cauterization and resuturing. In addition, he has a permanent scar, although it is above the hairline. In view of these findings and in particular, in considering the frightening and painful experience of the hemorrhage and treatments described above, it is felt that the trial court's award should be increased. The judgment of the trial court for David Ledbetter's pain and suffering will therefore be increased to $1,500.
Dr. Feder testified in detail concerning the injuries to Donald Ray Ledbetter, the four year old son of the plaintiff.[1]
The conclusion may be draw from all his testimony that the main injury suffered by this boy was a fracture of the left collar bone which was treated with a figure eight bandage.
In addition, Dr. Feder, who was the attending physician, felt that an attack of pneumonia which Donald Ray Ledbetter suffered for several days after the accident was brought on by "the aggravation of the trauma to the pre-existing condition the boy had."
No citations have been given on this item of damage by either plaintiffs or defendants which presents the same type of injuries. The Higginbotham case, cited supra, is again relied upon by plaintiff's attorney.
However, the injury of Leon Higginbotham Jr., included a fractured collar bone but the most serious element of his damage was the severe and permanent scars on his forehead.[2]
*666 Two relatively old cases in which substantial awards were made for injuries such as were suffered by Donald Ray Ledbetter were Mounes v. Bledsoe, La.App., 194 So. 55, in which an award of $1,500 was made for multiple abrasions and contusions of the body and a fracture of the shoulder blade and collar bone, and Campbell v. Walker, La.App., 183 So. 536, in which an award of $500 was given for a fracture of the right scapulashoulder bladeand a bruise on the right leg. The awards in these cases are particularly significant in view of the marked increase in the value of the dollar since the dates these opinions were written.
Taking into consideration the awards in the cited cases, the fact that the attending physician considered that the attack of pneumonia was a result of the accident and the painful fracture of the clavicle leaving no permanent injury, it is felt that the District Court's judgment was inadequate. Accordingly, judgment is granted for pain and suffering and disability occasioned by Donald Ray Ledbetter's injuries in the full sum of $1,000.
As a separate item of damage plaintiff sought damages for David's loss of a year of schooling at $50 per month to cover twelve months' room, board and clothing. It is felt that this item of damage has not been properly proven nor has any authority been given for recovery of such damages. For this reason, this claim will be disallowed.
The District Judge awarded Johnnie Smith $50 to cover the deductible amount on the collision insurance policy on his automobile. This judgment is not contested and is affirmed.
A tender was made by defendants of the full amount of the trial court's judgment herein including all costs and this tender also included medical expenses which were not even granted by the trial court.
Since the judgment on appeal is greater than either of the trial court's findings as to the amount tendered, such tender will not effect a suspension of interest charges, nor will it have the effect of taxing further costs to the plaintiffs herein. American Employers' Insurance Co. v. Hyman, 18 La.App. 455, 138 So. 719; Southern Plumbing & Supply Corporation v. Egert, La. App., 110 So.2d 762; Code Prac. Arts. 404-418, LSA-C.C. Arts. 2167-2169.
For the reasons assigned, the judgment appealed from is amended by increasing it as stated above, with legal interest from date of judicial demand. Defendants are taxed with all costs in both courts.
Amended and affirmed.
NOTES
[1] "The child had bleeding from the left nostril, acute upper respiratory infection with signs and symptoms of an acute pneumonities, Crepitation over the midclavicular region, three lacerations over the left scalp and left ear, nose swollen from a blow and left side of head swollen, left shoulder, arm and hand were traumatized and swollen in the region of the shoulder and arm, X-ray of the left chest shows a fracture of the left clavicle just lateral to the mid line, headaches, soreness of the lower back and left leg, and you have for three days after Dr. Feder began his treatment the child showed a progressive severe chest infection with bilateral pneumonia plus the toxic reaction from this infection.

* * * * *
"Yes, sir. This child suffered contusion and injuries to left shoulder, hand, mild concussion, laceration of left scalp. He also suffered fracture of the left collar bone. He developed a rather acute upper respiratory infection and a pneumonities following the accident and I had to clear this up. He has cleared up from all of his injuries. The clavicle has healed without deformity. He was discharged on April 18, 1958 * * * ".
[2] In the case of Higginbotham v. Frazier, La.App., 92 So.2d 89, 93, we quote the following pertinent portions:

"Leon Higginbotham Jr., 5 years of age, suffered severe larcerations about the head; a fractured collar-bone and right rib, both of which are healing satisfactorily without residual; minor abrasions; and a small non-painful particle remains in the tissue under the skin of his left arm. He was hospitalized for 5 days for his injuries, then received outpatient treatment. The most serious element of his damages is severe and permanent scarring on both sides of his forehead. Due to possible formation of keloids, the physician testifying believed it inadvisable to attempt cosmetic surgery."